1
2
3

UNITED STATES DISTRICT COURT

4

DISTRICT OF NEVADA

5

* * *

6

JOSEPH ANTONETTI,

Case No. 3:17-cv-00621-MMD-CLB

7

Petitioner,

ORDER

8

v.

9

FILSON, *et al.*,

10

Respondents.

11
12

**I.    SUMMARY**

13

Petitioner Joseph Antonetti, who is serving, *inter alia*, two consecutive sentences

14

of life without the possibility of parole after a jury found him guilty of, *inter alia*, first-degree

15

murder with the use of a deadly weapon, filed a petition for writ of habeas corpus under

16

28 U.S.C. § 2254. (*See* ECF No. 28-23.) This matter is before this Court for adjudication

17

of the merits of the remaining grounds in Antonetti's petition, which allege that the state

18

district court admitted improper evidence, the prosecution improperly commented on

19

Antonetti's failure to testify and failed to turn over evidence, trial and appellate counsel

20

were ineffective, and cumulative error. (ECF No. 19 ("Petition").) For the reasons

21

discussed below, this Court denies the Petition and a Certificate of Appealability.

22

**II.   BACKGROUND[1]**

23

Daniel Stewart testified that he was living with his girlfriend, Mary Amina, in Las

24

Vegas, Nevada on December 1, 2002. (ECF No. 27-38 at 62-63.) Prior to that date,

25

26

[1]The Court makes no credibility findings or other factual findings regarding the truth
or falsity of this evidence from the state court. This Court's summary is merely a backdrop

27

to its consideration of the issues presented in the case. Any absence of mention of a
specific piece of evidence does not signify the Court overlooked it in considering

28

Antonetti's claims.

Stewart and Amina had been helping Mike Bartoli retrieve his stolen shotgun from Amina's brother who had recently purchased it from Amina's ex-boyfriend. (*Id.* at 68-74.) On the night of December 1, 2002, Bartoli and Antonetti went to Stewart and Amina's apartment. (*Id.* at 74-75, 103.) Bartoli demanded that Stewart and Amina go with him to meet Amina's brother at a bar to retrieve the shotgun, but Stewart and Amina refused. (*Id.* at 76-77.) Bartoli got angry and threatened to take Stewart and Amina's property. (*Id.* at 77.) After Amina yelled at Bartoli, Antonetti said, "[y]ou don't know who we are. We are from North Town." (*Id.*) Amina responded, "[y]ou don't know who you're dealing with neither (sic)." (*Id.* at 78.) Antonetti then "pulled out a gun and shot" Stewart and Amina, killing Amina. (*Id.*) Stewart identified Antonetti as the shooter in a photographic lineup. (*Id.* at 83; ECF No. 28-1 at 143-46.)

A jury found Antonetti guilty of first-degree murder with the use of a deadly weapon, attempted murder with the use of a deadly weapon, and possession of a firearm by an ex-felon. (ECF Nos. 28-6; 28-4 at 20.) The jury imposed a sentence of life without the possibility of parole for the first-degree murder conviction. (ECF No. 28-12.) And the state district court imposed a consecutive sentence of life without the possibility of parole for the first-degree murder deadly weapon enhancement, two consecutive sentences of 96 to 240 months for attempted murder and the deadly weapon enhancement, and 28 to 72 months for possession of a firearm by an ex-felon. (ECF No. 28-23.) The Nevada Supreme Court denied Antonetti's direct appeal and, in relevant part,[2] affirmed the denial of his state habeas petition. (ECF Nos. 30-2, 33-13.)

## III.   LEGAL STANDARD

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

---

[2]Antonetti's state habeas petition was reversed and remanded, in part, "for the purpose of determining whether Antonetti established good cause to excuse his delay in asserting claims related to" a different judgment of conviction. (ECF No. 33-13 at 12–13.)

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at

75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

## IV.  DISCUSSION

### A. Ground 1—prior shooting

In ground 1, Antonetti alleges that his Fifth and Fourteenth Amendment rights were violated when the state district court improperly admitted evidence of the prior shooting of Suzanna Smith. (ECF No. 19 at 33.)

### 1.  Background information

Suzanna Smith testified that Antonetti was staying at her house on November 5, 2002. (ECF No. 28 at 178-79.) Antonetti overheard Smith talking to a friend "about the reasons [she] wanted him to move out of [her] house." (*Id.* at 183.) Smith and Antonetti argued, and Antonetti shot Smith nine times. (*Id.* at 184-85.) Jennifer Eversole, Smith's neighbor, testified that she called 9-1-1, and, after law enforcement arrived, Eversole heard Smith say that Antonetti shot her. (*Id.* at 195-98.) Detective James Stelk testified that he responded to the hospital and "overheard [Smith] tell the medical staff that she'd been shot by Joey Antonetti." (*Id.* at 173-74.) James Krylo, a firearms examiner, testified that he "compare[d] the cartridge cases from the November [shooting of Smith] to the cartridge cases from the December" shooting of Amina and Stewart and determined that the cartridges were "fired from the same gun." (*Id.* at 215, 220-221.) Bartoli testified that he confronted Antonetti a few days after the shooting of Amina and Stewart, and Antonetti told him, *inter alia*, that "[h]e was staying with some girl; got into an argument with her. She tried to call the police on him. He said he shot her" with the same gun that he used to shoot Amina and Stewart. (ECF No. 27-38 at 174, 176.)

Before trial, the state district court granted Antonetti's motion to sever the charges arising from the shooting of Amina and Stewart from the charges arising from the shooting of Smith, explaining "there's no common plan" because "[o]ne is a domestic violence" and

the other "is an enforcement to try to get property back." (ECF No. 27-6 at 14.) The State then moved to allow evidence of the shooting of Smith as a bad act at Antonetti's trial on the shootings of Amina and Stewart. (ECF No. 27-10.) At the hearing on the motion, the state district court determined that the evidence was admissible because "the identity issue [was] relevant" and "the probative value of [the] evidence [was] substantially outweighed by the risk of prejudice." (ECF No. 27-34 at 30-31.)

### 2. State court determination

In affirming Antonetti's judgment of conviction, the Nevada Supreme Court held:

> Antonetti argues that the district court erred by allowing the State to introduce evidence of the unrelated November shooting during trial. Antonetti urges that the two incidents were not part of a common scheme or plan, that the November shooting did not demonstrate motive, opportunity, or identity, and was more prejudicial than probative.
>
> NRS 48.045(2) provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of the person in order to show that he acted in conformity therewith." However, evidence of other crimes or wrongs may be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
>
> Notwithstanding that prior bad acts evidence is admissible for limited purposes, "this court has often looked upon the admission of prior bad acts evidence with disfavor because the evidence is often irrelevant and prejudicial, and forces a defendant to defend against vague and unsubstantiated charges." *Rhymes v. State*, 120 Nev. ___, ___, 107 P.3d 1278, 1280 (2005). Therefore, the State bears the burden of establishing the evidence's admissibility at a hearing outside the presence of the jury by demonstrating: "(1) the incident is relevant to the crime charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." *Id.* at ___, 107 P.3d at 1281 (quoting *Tinch v. State*, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997)). "[T]he decision to admit or exclude such evidence is within the discretion of the trial court and will not be overturned absent a showing that the decision is manifestly incorrect." *Id.*
>
> Where questions are raised as to the credibility of witnesses' trial identification, the need for additional evidence to establish identity is enhanced. *Reed v. State*, 95 Nev. 190, 193, 591 P.2d 274, 276 (1979). If the identity of a perpetrator is in issue, evidence of prior crimes may be admitted in order to prove identity provided the prejudicial effect is outweighed by the evidence's probative value. *See Mayes v. State*, 95 Nev.

140, 142, 591 P.2d 250, 251 (1979). Additionally, the prior bad act must demonstrate "characteristics of conduct" unique and common to the defendant and the perpetrator whose identity is in issue. *See generally Coty v. State*, 97 Nev. 243, 627 P.2d 407 (1981).

The November shooting was primarily used to show the identity of the shooter. This was clearly relevant to Antonetti's defense that he was not present at the time the shooting occurred. Because identity was a key issue at trial, we conclude the probative value of the identity of the November shooting outweighed any prejudice to Antonetti.

Therefore, we conclude that the district court did not err in allowing the admission of evidence of the November shooting.

(ECF No. 30-2 at 3-5.)

### 3.    Conclusion

"A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005). "[C]laims deal[ing] with admission of evidence" are "issue[s] of state law," *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009), and "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764 (1990). Therefore, the issue before this Court is "whether the state proceedings satisfied due process." *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). In order for the admission of evidence to provide a basis for habeas relief, the evidence must have "rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)). Not only must there be "no permissible inference the jury may draw from the evidence," but also the evidence must "be of such quality as necessarily prevents a fair trial." *Jammal*, 926 F.2d at 920 (emphasis in original) (citation omitted).

The introduction of evidence that Antonetti shot Smith less than a month before the shootings of Amina and Stewart was detrimental to Antonetti. However, it cannot be concluded that the admission of this evidence rendered his trial fundamentally unfair in violation of due process. *See Estelle*, 502 U.S. at 67; *Sublett*, 63 F.3d at 930; *Jammal*, 926 F.2d at 920. As the Nevada Supreme Court reasonably noted, this evidence was

admitted for the permissible purpose under Nevada law of showing the shooter's identity. *See* NRS § 48.045(2) ("Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as . . . identity."). Antonetti's defense was that Stewart, who testified that Antonetti shot him with a 9-millimeter gun, was mistaken when he identified him as the shooter because although he possessed a 9-millimeter gun on the night of the shooting, Amina and Stewart were shot with a .25-caliber gun. Antonetti alleged that Bartoli must have shot Amina and Stewart and accused Antonetti to protect himself. However, because Smith, who identified Antonetti as the person who shot her, was shot with the same gun as Amina and Stewart, evidence of Smith's shooter assisted in identifying Anima and Stewart's shooter.

Further, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Yarborough*, 568 F.3d at 1101 (citing 28 U.S.C. § 2254(d)); *see also Dowling v. United States*, 493 U.S. 342, 352 (1990) (explaining that the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly"). And importantly, the Supreme Court "has not yet made a ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id.*

Antonetti is not entitled to federal habeas relief for ground 1.

### B. Ground 2—admission of custodial telephone calls

In ground 2, Antonetti alleges that his Fifth and Fourteenth Amendment rights were violated when the state district court improperly admitted his custodial telephone

calls regarding an attempted escape because those telephone calls contained vulgar, sexual, and threatening comments.[3] (ECF No. 19 at 36-37.)

Antonetti included this claim in the appeal of his judgment of conviction, but the Nevada Supreme Court did address it in its order of affirmance. (*See* ECF Nos. 29-27 at 32-35; 30-2.) 28 U.S.C. § 2254(d) generally applies to unexplained as well as reasoned state-court decisions: "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 562 U.S. at 99. When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "determine[s] what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme] Court." *Id.* at 102.

### 1.    Background information

Kevin Strobeck, a detention sergeant with the Las Vegas Metropolitan Police Department, testified that he found evidence that Antonetti was planning an escape from the Clark County Detention Center prior to trial. (ECF No. 28 at 237, 243.) After finding that evidence, Strobeck listened to approximately 100 telephone calls Antonetti made from the Clark County Detention Center. (*Id.* at 243-45.) Antonetti's counsel objected to the admission of those telephone calls because they "ma[d]e Mr. Antonetti seem like a menace because of the way he talks on the telephone" and Strobeck could "say what was said in the phone calls." (ECF No. 28-1 at 6-7.) The state district court ruled that the State would be allowed to play the telephone calls to the jury, explaining that it was convinced that the prosecutors did "everything possible to pare [the telephone calls]

---

[3]This Court previously dismissed "the portion of Ground 2 related to the evidence of an escape and related phone calls." (ECF No. 43 at 4.)

1   down and just get to the essentials of proving there was an attempted escape." (*Id.* at

2   17.)

3         The State played portions of nine telephone calls for the jury. In those calls,

4   Antonetti made, *inter alia*, the following comments: "[y]ou're fucking retarded"; "I'm not

5   even playing, you worthless mother-fucker. You better not have no punk ass bitch telling

6   you you [sic] better not call, something like that, some tweaker shit"; "I'll beat Jack up";

7   "[f]uck that, bitch"; "[h]e's like a hooker on the boulevard"; "[r]etard, retard. God, man, I

8   love that dude. Why is he such a slackard? And short. And he ain't got no chin, fucker";

9   "[m]other-fucker, you heard me. I didn't stutter, hooker. Spread your cheeks"; "[f]ucking

10  little short wannabee." (*Id.* at 27-31, 36, 39, 45.) After the telephone calls were played,

11  Antonetti's counsel moved for a mistrial. (*Id.* at 64.) The state district court denied the

12  motion, ruling that the comments were "harmless references, joking." (*Id.* at 66.)

### 2.      Conclusion

14        As discussed in ground 1, the Supreme Court "has not yet made a ruling that

15  admission of irrelevant or overtly prejudicial evidence constitutes a due process violation

16  sufficient to warrant issuance of the writ." *Yarborough*, 568 F.3d at 1101. And it is not

17  clear how this evidence necessarily prevented a fair trial in violation of due process. *See*

18  *Jammal*, 926 F.2d at 920. Accordingly, fairminded jurists would not disagree that denial

19  of this ground is consistent with prior United States Supreme Court decisions. *See*

20  *Harrington*, 562 U.S. at 102. Antonetti is not entitled to federal habeas relief for ground

21  2.[4]

22  ───────────────

23        [4]In ground 3, Antonetti alleged that his Fifth, Sixth, and Fourteenth Amendment
    rights were violated when the state district court excluded bad act evidence by Bartoli.

24  (ECF No. 19 at 38.) In his opposition to the State's motion to dismiss the petition, Antonetti
    stated, "[t]he state is correct that Ground 3 was procedurally barred by the Nevada

25  Supreme Court." (ECF No. 40 at 7.) As such, this Court noted in its order on the motion
    to dismiss that "Antonetti . . . withdrew Ground 3 as procedurally barred." (ECF No. 43 at

26  2 n.2.) However, Antonetti later noted in his reply that "the State did not address this claim
    in its Answer," so "[f]or the reasons set forth in the Amended Petition, habeas relief must

27  be granted." (ECF No. 51 at 7.) Because Antonetti withdrew ground 3—or failed to move
    for reconsideration of this Court's order finding that he withdrew ground 3 if he did not

28  intend to do so—this Court will not address ground 3.

### C.  Ground 6—reference to failure to testify

In ground 6, Antonetti alleges that his Fifth and Fourteenth Amendment rights were violated when the prosecutor referenced his failure to testify. (ECF No. 19 at 47.)

#### 1.        Background information

During closing arguments, the prosecutor said: "The issue is: Who shot them? That's what we have been here for the last four days asking ourselves: Who shot these people? Was it Mr. Bartoli? Or was it this defendant? Well, there were only four people in that apartment that night; only four people that could tell us." (ECF No. 28-3 at 49.) Antonetti's counsel objected, and a bench conference was held. (*Id.*) The prosecutor continued: "Four people in that apartment . . . the night of the shooting. The first person, Mary Amina, is dead. She was killed on that night. She can't tell you what happened." (*Id.*) The prosecutor then outlined Stewart's and Bartoli's testimonies and discussed the evidence presented against Antonetti, "the fourth person that was there." (*Id.* at 49-57.)

After closing arguments, outside the presence of the jury, Antonetti's counsel explained that he had objected based on "a Fifth Amendment violation." (*Id.* at 115.) The state district court commented: "Certainly there was no mention about the defendant's right to remain silent being commented on. There was [sic] four witnesses and the State did not go into that." (*Id.*)

#### 2.        Standard for prosecutorial misconduct generally

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Brown v. Borg*, 951 F.2d

_____

Ground 4 was dismissed. (ECF No. 43 at 6.) Ground 5 will be discussed with ground 8(a)(2).

1011, 1017 (9th Cir. 1991) ("Improprieties in closing arguments can, themselves, violate due process."). A court must judge the remarks "in the context in which they are made." *Boyde v. California*, 494 U.S. 370, 385 (1990). "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

### 3.    Standard for comments on failure to testify

The Fifth Amendment commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) ("We hold today that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the State."). A prosecutor's comments on a defendant's failure to testify violates the self-incrimination clause of the Fifth Amendment. *See Griffin v. California*, 380 U.S. 609, 615 (1965); *see also United States v. Robinson*, 485 U.S. 25, 32 (1988) ("Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, *Griffin* holds that the privilege against compulsory self-incrimination is violated."). While the prosecution violates *Griffin* when it "direct[ly] comment[s] about the defendant's failure to testify," the prosecution only violates *Griffin* when it "indirect[ly] comment[s about the defendant's failure to testify] . . . 'if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify.'" *Hovey v. Ayers*, 458 F.3d 892, 912 (9th Cir. 2006) (quoting *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987)). "Reversal is warranted [for *Griffin* error] only where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for the conviction, and where there is evidence that could have supported acquittal." *Id.* (internal quotation marks omitted); *see also Lincoln*, 807 F.2d at 809 ("[C]ourts will not reverse when the prosecutorial comment is a single, isolated

incident, does not stress an inference of guilt from silence as a basis of conviction, and is followed by curative instructions.").

### 4.    State court determination

In affirming Antonetti's judgment of conviction, the Nevada Supreme Court held:

> During closing argument, the prosecutor referred to the fact that there were only four people in the apartment the night of the shootings, and that only four people could tell the jury who the shooter was. Antonetti's attorney immediately objected and the jury convened an off the record discussion at the bench. After the bench discussion, the State made no further comment on Antonetti's failure to testify.
>
> Antonetti argues that his conviction should be overturned because the prosecution improperly commented on his failure to testify during closing argument. Specifically, the prosecutor's statement implied that Antonetti was one of four people who could have explained what happened in the apartment on the night of the shooting.
>
> "Indirect references to a defendant's failure to testify are constitutionally impermissible if 'the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify.'" *Barron v. State*, 105 Nev. 767, 779 783 P.2d 444, 451-52 (1989). "The context of the prosecutor's comment must be taken into account in determining whether a defendant should be afforded relief." *Bridges v. State*, 116 Nev. 752, 764, 6 P.3d 1000, 1008 (2000). "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comment standing alone." *Knight v. State*, 116 Nev. 140, 144-45, 993 P.2d 67, 71 (2000) (quoting *U.S. v. Young*, 470 U.S. 1, 11 (1985)).
>
> We conclude that the prosecutor's statement, when viewed in context, was not an impermissible comment on Antonetti's refusal to testify. *See Bean v. State*, 81 Nev. 25, 36, 398 P.2d 251, 258 (1965)). The statement was merely a prelude to a summary of the testimony from witnesses the State has presented at trial. *See Septer v. Warden*, 91 Nev. 84, 87-88, 540 P.2d 1390, 1392 (1975). Moreover, the statement was not "manifestly intended to be a comment" on Antonetti's failure to testify. Nor, was it "of such a character that the jury would naturally and necessarily take it to be a comment" on Antonetti's failure to testify. We therefore hold that the statement did not amount to prosecutorial misconduct; nor did it infringe upon Antonetti's rights as a criminal defendant.

(ECF No. 30-2 at 6-8.)

### 5.      Conclusion

As the Nevada Supreme Court reasonably determined, the prosecutor's statement that there were "only four people that could tell" what happened the night of the shooting was given as a prelude to its summaries of two of the individuals who were present during the shooting: Stewart and Bartoli. Viewed in context, the comment was not manifestly intended to call attention to Antonetti's failure to testify and was not of such a character that the jury would have taken the comment as referring to Antonetti's failure to testify. *See Hovey*, 458 F.3d at 912; *cf. United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir. 1989) ("The prosecutor in this case was simply trying to explain the rationale for his burden of proof, rather than calling attention to Gray's decision not to testify."). Accordingly, the Nevada Supreme Court reasonably concluded that the prosecutor's statement was not an impermissible comment in violation of *Griffin*, so there was no prosecutorial misconduct. Antonetti is not entitled to federal habeas relief for ground 6.

### D.  Ground 7—*Brady*

In ground 7, Antonetti alleges that his Fifth and Fourteenth Amendment rights were violated because the prosecution failed to turn over or present his 9-millimeter gun that was impounded upon his apprehension by law enforcement. (ECF No. 19 at 48.) Antonetti explains that this evidence was exculpatory because it was his defense that "he pulled the 9-millimeter gun that was the only gun Stewart saw, so Bartoli must have pulled and shot the .25 caliber gun that killed Amina and wounded Stewart." (*Id.* at 49.)

### 1.      Background information

Stewart testified that Antonetti shot him and Amina with a black or blue 9-millimeter gun. (ECF No. 27-38 at 62, 107–09.) Stewart saw Antonetti pull out the gun and watched it "extensively," explaining that he was certain it was not silver and was, indeed, a 9-millimeter gun.[5] (*Id.* at 113–14.) However, the evidence presented at

---

[5]Contrary to Stewart's testimony, Bartoli testified that Antonetti initially pulled out a 9-millimeter gun without a clip during the argument with Amina and Stewart, but Antonetti

Antonetti's trial was that a .25-caliber gun was used to shoot Amina and Stewart—not a 9-millimeter gun. (ECF Nos. 28 at 91, 121; 28-1 at 231–32.) The .25-caliber gun used to shoot Amina and Stewart was never found. (ECF No. 28-1 at 232.) When Antonetti was apprehended by law enforcement, a black Taurus 9-millimeter semi-automatic handgun was found "in the near vicinity." (*Id.* at 72, 82.) Law enforcement impounded that 9-millimeter gun, but it was not presented as evidence at Antonetti's trial. (*Id.* at 80-81.) Consistent with his defense, the prosecution played a recorded telephone call from Antonetti made at the Clark County Detention Center, in which Antonetti stated, "I didn't even have [a small caliber] gun. I had a much bigger gun . . . a nine millimeter." (*Id.* at 163-64.)

## 2.      Standard for a *Brady* claim

"[T]he suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The materiality of the evidence that has been suppressed is assessed to determine whether prejudice exists. *See Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

---

later "pull[ed] out another gun," a .25 semi-automatic, and shot Amina and Stewart. (ECF No. 7-38 at 143, 168-69, 171-72.)

1    Accordingly, "[a] 'reasonable probability' of a different result is . . . shown when the

2    government's evidentiary suppression 'undermines confidence in the outcome of the

3    trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678).

### 3.    State court determination

5    In affirming, in part, and reversing, in part, the denial of Antonetti's state habeas

6    petition, the Nevada Supreme Court held:

> Antonetti claims that the State violated *Brady v. Maryland*, 373 U.S.
> 83 (1963), by failing to turn over evidence related to his possession of a
> handgun not used in the shooting. This claim is repelled by the record. *See*
> *Hargrove v. State*, 100 Nev. 498, 502-03, 686 P.2d 222, 225 (1984). As
> noted in Antonetti's petition, the State introduced evidence that, during
> Antonetti's arrest, officers recovered a weapon that was not the same
> caliber of weapon that was used in the shooting.

12    (ECF No. 33-13 at 4.)

### 4.    Conclusion

14    The Nevada Supreme Court reasonably determined that the failure to turn over

15    the 9-millimeter gun to the defense was not a violation of *Brady* because Antonetti fails

16    to demonstrate prejudice. The 9-millimeter gun itself was immaterial. The prosecution

17    introduced evidence that law enforcement recovered a black 9-millimeter gun—the

18    description of which matched Stewart's description of the gun Antonetti brandished the

19    night of the shooting—during Antonetti's arrest. That evidence supported Antonetti's

20    defense that Stewart mistakenly thought Antonetti was the shooter because he was in

21    possession of a 9-millimeter gun, but it was Bartoli who shot Amina and Stewart with a

22    .25-caliber gun and accused Antonetti to protect himself.

23    Antonetti argues that evidence that a 9-millimeter gun was recovered during his

24    arrest was not enough because "if the jury ha[d] seen it, and seen that it matched the

25    gun described by the surviving victim but not the caliber of the bullets that entered the

26    victims' bodies, it would have provided powerful evidence to support the defense that it

27    was Bartoli, not [him], who shot the victims." (ECF No. 51 at 17.) This conclusory

28    argument lacks merit. Due to this evidence of the 9-millimeter gun's existence and

1  description, there is no reasonable probability that, had the 9-millimeter gun itself been

2  turned over to the defense and presented to the jury, the result of Antonetti's trial would

3  have been different. *See Bagley*, 473 U.S. at 682.

4       Antonetti is not entitled to federal habeas relief for ground 7.

5  **E. Grounds 5 and 8—effective assistance of trial counsel**

6       In ground 5, 8(a),[6] 8(b), and 8(c), Antonetti makes various allegations regarding

7  his trial counsel's effectiveness. (ECF No. 19 at 42, 50-51.)

8  **1.       Standard for effective assistance of trial counsel**

9       In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for

10  analysis of claims of ineffective assistance of counsel requiring the petitioner to

11  demonstrate (1) that the attorney's "representation fell below an objective standard of

12  reasonableness," and (2) that the attorney's deficient performance prejudiced the

13  defendant such that "there is a reasonable probability that, but for counsel's

14  unprofessional errors, the result of the proceeding would have been different." 466 U.S.

15  668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel

16  must apply a "strong presumption that counsel's conduct falls within the wide range of

17  reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that

18  counsel made errors so serious that counsel was not functioning as the 'counsel'

19  guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish

20  prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the

21  errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.

22  Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial

23  whose result is reliable." *Id.* at 687.

24       Where a state district court previously adjudicated the claim of ineffective

25  assistance of counsel under *Strickland*, establishing that the decision was unreasonable

26  is especially difficult. *See Harrington*, 562 U.S. at 104-05. In *Harrington*, the United

27

28       [6]This Court has divided ground 8(a) into subparts: 8(a)(1) and 8(a)(2).

States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *See id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

### 2.      Grounds 5 and 8(a)(2)

In grounds 5 and 8(a)(2), Antonetti alleges that his Sixth Amendment right to counsel was violated because counsel failed to object to the medical examiner's testimony on the grounds that it violated the Confrontation Clause. (ECF No. 19 at 42, 50.)

### a.      Background information

Dr. Ronald Knoblock, a medical examiner at the Clark County Coroner's Office, testified that he reviewed Dr. Donna Smith's autopsy report of Amina, autopsy photographs, and grand jury testimony because Dr. Smith was no longer employed by the Clark County Coroner's Office at the time of Antonetti's trial. (ECF No. 28 at 76-78.) Dr. Knoblock testified that Dr. Smith performed the autopsy of Amina on December 3, 2002, and that her "external observations were that [Amina] had a gunshot wound of entrance on the right side of her nose . . . [and] a gunshot wound of entrance on the top of her head." (*Id.* at 79.) Dr. Knoblock reported that he was able to identify stippling around the wound on Amina's face, which indicated that the gun was "within two to three feet or so of" Amina when she was shot. (*Id.*) Dr. Knoblock then explained the trajectory of the two bullets after they entered Amina, explained that either wound could have been fatal, and reported that Amina's toxicology report showed methamphetamine in her system. (*Id.* at 80-82.) Dr. Knoblock concurred with Dr. Smith's conclusion that the cause

17

of Amina's death was multiple gunshot wounds to the head and that the manner of death was homicide. (*Id.* at 87.)

### b.    State court determination

In affirming, in part, and reversing, in part, the denial of Antonetti's state habeas petition, the Nevada Supreme Court held:

> Antonetti claimed that counsel should have objected to the medical examiner's testimony because it violated *Crawford v. Washington*, 541 U.S. 36 (2004). We conclude that Antonetti failed to demonstrate that trial counsel acted deficiently for two reasons. First, *Crawford* was decided a year after the medical examiner testified at Antonetti's trial and counsel cannot be faulted for failing to anticipate the decision. *See Nika v. State*, 124 Nev. 1272, 1289, 198 P.3d 839, 851 (2008) ("[C]ounsel's failure to anticipate a change in the law does not constitute ineffective assistance of counsel even where the theory upon which the court's later decision is based is available, although the court had not yet decided the issue." (internal quotation marks omitted)). Second, while the witness described the evidence noted during the autopsy and noted the conclusions, he provided his own independent opinion based on the injuries documented during the autopsy. This testimony did not violate the Confrontation Clause. *See Vega v. State*, 126 Nev. 332, 340 P.3d 632, 638 (2010). Therefore, the district court did not err in denying this claim.

(ECF No. 33-13 at 10-11.)

### c.    Conclusion

Antonetti's trial took place in November 2003. (*See* ECF No. 27-37 at 2.) Four months later, on March 8, 2004, the United States Supreme Court determined that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). Consequently, as the Nevada Supreme Court reasonably concluded, Antonetti's counsel could not have based a challenge to Dr. Knoblock's testimony on *Crawford*. It is true, as Antonetti argues, that *Crawford* was argued before the United States Supreme Court shortly before his trial took place, so counsel should have been aware of the issues in *Crawford* and objected to Dr. Knoblock's testimony for preservation purposes.

(ECF No. 51 at 9.) However, even if *Crawford* was under consideration at the time of Antonetti's trial, he fails to demonstrate that counsel acted deficiently in not raising an argument that was, at the time, unsupported by law. *See Pinkston v. Foster*, 506 Fed. App'x 539, 542 (9th Cir. 2013) ("It was not deficient performance for [petitioner's] appellate counsel not to argue what was, at the time, a losing proposition."). Further, *Crawford* did not clearly establish that autopsy reports are testimonial. *See Meras v. Sisto*, 676 F.3d 1184 (9th Cir. 2012). Thus, because the Nevada Supreme Court's determination constituted an objectively reasonable application of *Strickland*'s performance prong, Antonetti is not entitled to federal habeas relief on ground 5.

### 3.    Ground 8(a)(1)

In ground 8(a)(1), Antonetti alleges that his Sixth Amendment right to counsel was violated because counsel failed to object to the introduction of Jamie Heller's hearsay testimony during the prosecutor's opening statements. (ECF No. 19 at 50.)

### a.    Background information

During the prosecutor's opening statement, she commented:

> When the defendant was apprehended, he was with his girlfriend and she's a young woman, goes by the name of Jamie Heller. She will be called as a witness in this case.
> She's in love with the defendant, and I'm sure you will sense, when you see her testimony, that she is not thrilled about being called as a witness by the State of Nevada.
> But Jamie did give an interview to detectives and she explained that her boyfriend had been hanging out with a guy by the name of Michael Bartoli; and she said she knew something about a murder of a young woman and that a young man had gotten shot.
> She said that Bartoli and the defendant had gone to the apartment and that the dead girl had a bad mouth, as she put it.
> She also explained that she knew something about the two being shot by a small caliber weapon.

(ECF No. 27-38 at 21.)

At trial, outside the presence of the jury, the prosecution said that it intended to call Heller to testify, but Heller and her counsel informed the state district court that Heller intended to "invoke her privilege against self-incrimination." (ECF No. 28-1 at 128-29,

132.) The prosecution offered Heller immunity, but Heller refused to testify. (*Id.* at 131, 218-222.) However, Detective Dan Long testified that Heller "was arrested at the same time and same place as Mr. Antonetti" and that he interviewed her. (ECF No. 28-1 at 135, 152.)

### b.     State court determination

In affirming, in part, and reversing, in part, the denial of Antonetti's state habeas petition, the Nevada Supreme Court held:

> Antonetti claimed that trial counsel was ineffective for failing to object to the prosecutor's reference to hearsay evidence during opening arguments. Antonetti failed to demonstrate that counsel acted unreasonably or that he was prejudiced because the prosecutor's statements properly referred to evidence the State intended to introduce at trial. *See Greene v. State*, 113 Nev. 157, 170, 931 P.2d 54, 62 (1997) ("A prosecutor has a duty to refrain from stating facts in opening statement that he [or she] cannot prove at trial."), *overruled on other grounds by Byford v. State*, 116 Nev. 215, 235, 994 P.2d 700, 713 (2000); *see also Garner v. State*, 78 Nev. 366, 371, 374 P.2d 525, 528 (1962) (noting that appellate courts rarely find error when prosecutor's statement about "certain proof, which is later rejected, will be offered"). Therefore, the district court did not err in denying this claim.

(ECF No. 33-13 at 5-6.)

### c.     Conclusion

As the Nevada Supreme Court reasonably determined, the prosecutor's opening statement was an objective summary of the testimony she reasonably expected from Heller. Because Heller had not yet indicated her refusal to testify, Antonetti's counsel had no basis to object to the prosecutor's opening statement regarding Heller's expected testimony. Therefore, because the Nevada Supreme Court's determination constituted an objectively reasonable application of *Strickland*'s performance prong, Antonetti is not entitled to federal habeas relief for ground 8(a)(1).

### 4.     Ground 8(b)

In ground 8(b), Antonetti alleges that his Sixth Amendment right to counsel was violated because counsel failed to investigate, secure, and present the 9-millimeter gun to the jury. (ECF No. 19 at 51.)

### a. State court determination

In affirming, in part, and reversing, in part, the denial of Antonetti's state habeas petition, the Nevada Supreme Court held:

> Antonetti claimed that trial counsel should have presented evidence of his possession of a handgun that was not alleged to have been used in the shootings. We conclude that Antonetti failed to demonstrate that trial counsel acted unreasonably or that he was prejudiced because the fact that he had a different weapon at the time of his arrest, a week after the shooting, does not preclude his use of a different weapon earlier. Therefore, the district court did not err in denying this claim.

(ECF No. 33-13 at 6.)

### b. Conclusion

It is true that defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. However, Antonetti fails to articulate what investigation counsel should have made regarding the 9-millimeter gun. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations . . . do not warrant habeas relief."). And regarding securing and presenting the 9-millimeter gun to the jury, as was discussed in ground 7, Antonetti fails to establish how presentation of the 9-millimeter gun itself was necessary. There was evidence presented that law enforcement impounded a 9-millimeter gun—the sole gun Antonetti argues he brought to Amina and Stewart's apartment and was not used to shoot Amina and Stewart. That evidence was beneficial to Antonetti's defense. Accordingly, Antonetti fails to demonstrate that additional evidence in the form of the 9-millimeter gun itself would have changed the result of his trial. Because the Nevada Supreme Court's determination constituted an objectively reasonable application of *Strickland*'s prejudice prong, Antonetti is not entitled to federal habeas relief for ground 8(b).

### 5.   Ground 8(c)

In ground 8(c), Antonetti alleges that his Sixth Amendment right to counsel was violated because counsel failed to object to Detective Long's testimony interpreting

Antonetti's "code words" during his custodial telephone calls on the grounds that Detective Long was not an expert and there was no foundation established for his interpretations. (ECF No. 19 at 51.)

### a.   Background information

Detective Long testified that he listened to "[m]ore than 500" telephone calls made by Antonetti. (ECF No. 28-1 at 135, 155.) After reading the transcripts of some of those calls to the jury, Detective Long testified that "inmates sometimes speak in code languages." (*Id.* at 169.) Detective Long explained that Antonetti used several code words for gun: "[t]hey begin by using the word 'thingy'. [sic] They use toothbrush. I believe, at one time, they used paperwork." (*Id.*) Detective Long also explained that Antonetti's code word for ammunition was "batteries." (*Id.* at 171.) Antonetti's counsel "object[ed] to supposition on thingies." (*Id.*) The state district court responded, "[y]ou can certainly cross-examine on it. He says in his experience and looking at the whole thing." (*Id.*)

### b.   State court determination

In affirming, in part, and reversing, in part, the denial of Antonetti's state habeas petition, the Nevada Supreme Court held:

> Antonetti argued trial counsel should have objected to lay opinion testimony during the Amina/Stewart trial about the coded slang Antonetti used in jail phone calls. Antonetti failed to demonstrate deficient performance or prejudice because trial counsel objected to the detective's testimony in which he defined some of the coded words Antonetti used in the conversations, the district court sustained the objection, the context of many of the coded calls indicates that the language refers to firearms or illicit items absent the opinion testimony, and there was sufficient evidence of Antonetti's guilt even without testimony about his recorded phone calls. Therefore, the district court did not err in denying this claim.

(ECF No. 33-13 at 9.)

### c.   Conclusion

Counsel objected to Detective Long's testimony concerning his beliefs regarding Antonetti's code word for guns. As such, counsel's performance was reasonable.

22

Further, Antonetti fails to demonstrate prejudice since the state district court permitted Long's testimony based on his "experience" and familiarity with the telephone calls. Because the Nevada Supreme Court's determination constituted an objectively reasonable application of *Strickland*'s performance and prejudice prongs, Antonetti is not entitled to federal habeas relief for ground 8(c).

### F.   Ground 9—effective assistance of appellate counsel

In ground 9, Antonetti alleges that his Sixth Amendment right to counsel was violated because appellate counsel failed to challenge the introduction of evidence of the escape plot on direct appeal. (ECF No. 19 at 52.)

#### 1.        Background information

As mentioned in ground 2, detention officer Strobeck testified that he found evidence that Antonetti and several other inmates were planning an escape from the Clark County Detention Center prior to Antonetti's trial. (ECF No. 28 at 237, 243.) Strobeck explained that he "found a hole in the window" of a module at the Clark County Detention Center and other officers "located a rope and some hack saw blades and some saws and some gloves." (*Id.* at 238, 242.) Strobeck contacted Antonetti regarding the attempted escape and found that Antonetti "had several cuts on his hand, consistent with scraping against his glass." (*Id.* at 240.)

#### 2.        Standard for effective assistance of appellate counsel

When the ineffective assistance of counsel claim is based on appellate counsel's actions, a petitioner must show "that [appellate] counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them" and then "that, but for his [appellate] counsel's unreasonable failure to file a merits brief, [petitioner] would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

#### 3.        State court determination

In affirming, in part, and reversing, in part, the denial of Antonetti's state habeas petition, the Nevada Supreme Court held:

1
2
3
4

> Antonetti claimed that appellate counsel should have challenged the introduction of evidence about his escape attempt. We conclude that Antonetti failed to demonstrate deficient performance or prejudice because evidence that Antonetti attempted to escape custody was admissible to show his consciousness of guilt. *See Reese v. State*, 95 Nev. 419, 423, 596 P.2d 212, 215 (1979). Therefore, the district court did not err in denying this claim.

5   (ECF No. 33-13 at 7.)

6   ### 4.    Conclusion

7   Because the Nevada Supreme Court, the final arbiter of Nevada law, determined

8   that evidence of Antonetti's attempted escape was admissible under Nevada law,

9   Antonetti fails to demonstrate that inclusion of this ground in his direct appeal would

10   have been successful. *See Smith*, 528 U.S. at 285. Thus, because the Nevada Supreme

11   Court reasonably determined that Antonetti failed to demonstrate prejudice, Antonetti is

12   not entitled to federal habeas relief for ground 9.[7]

13   ### G.  Ground 11—cumulative error

14   In ground 11, Antonetti alleges that he is entitled to habeas relief based on

15   cumulative error. (ECF No. 19 at 53.) In affirming Antonetti's judgment of conviction, the

16   Nevada Supreme Court held that "if any errors were committed at trial, they were

17   harmless in light of substantial evidence of guilt," so "Antonetti's cumulative error

18   argument lacks merit." (ECF No. 30-2 at 15.) And in affirming, in part, and reversing, in

19   part, the denial of Antonetti's state habeas petition, the Nevada Supreme Court held:

20   "Antonetti claimed that the cumulative effect of counsel's errors warrants relief. As

21   Antonetti failed to demonstrate any error, we conclude that no relief is warranted on this

22   claim." (ECF No. 33-13 at 11.)

23

24   _____

[7]In ground 10, Antonetti alleged that he is entitled to habeas relief because he is
25   innocent. (ECF No. 19 at 52.) In his opposition to the State's motion to dismiss the petition,
Antonetti withdrew ground 10. (ECF No. 40 at 6.) As such, this Court noted in its order on
26   the motion to dismiss that Antonetti withdrew "Ground 10 as unexhausted." (ECF No. 43
at 2 n.2.) However, Antonetti included ground 10 in his reply, noting that "[t]he State did
27   not address this [ground] in its Answer, so nothing more needs to be added." (ECF No.
51 at 7.) Because Antonetti withdrew ground 10, Respondents had no need to answer it,
28   and this Court will not address it.

1    Cumulative error applies where, "although no single trial error examined in
2 isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple
3 errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381
4 (9th Cir. 1996); *see also Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004)
5 (explaining that the court must assess whether the aggregated errors "'so infected the
6 trial with unfairness as to make the resulting conviction a denial of due process'" (citing
7 *Donnelly*, 416 U.S. at 643). Because there are no errors to accumulate, Antonetti is not
8 entitled to federal habeas relief for ground 11.[8]

9 **V.    CERTIFICATE OF APPEALABILITY**

10    This is a final order adverse to Antonetti. Rule 11 of the Rules Governing Section
11 2254 Cases requires this Court to issue or deny a certificate of appealability ("COA").
12 Therefore, this Court has *sua sponte* evaluated the claims within the petition for suitability
13 for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851,
14 864-65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when
15 the petitioner "has made a substantial showing of the denial of a constitutional right." With
16 respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable
17 jurists would find the district court's assessment of the constitutional claims debatable or
18 wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S.
19 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists
20 could debate (1) whether the petition states a valid claim of the denial of a constitutional
21 right and (2) whether this Court's procedural ruling was correct. *See id.*

22    Applying these standards, this Court finds that a certificate of appealability is
23 unwarranted.

24 ///

25 ///

26    _____

27 [8]Antonetti requests that an evidentiary hearing be conducted. (ECF No. 19 at 53.)
Antonetti fails to explain why an evidentiary hearing is needed or what evidence would be
28 presented at an evidentiary hearing. Antonetti's request for an evidentiary hearing is
denied.

## VI.    CONCLUSION

It is therefore ordered that the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF No. 19) is denied.

It is further ordered that a certificate of appealability is denied.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 9th Day of December 2021.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE